George RUDEBUSCH, et al., Plaintiffs,

v.

State of ARIZONA, et al., Defendants.

Nos. CIV 95–1313–PCT RCB,
CIV 96–1077–PCT RCB.

United States District Court,
D. Arizona.

June 7, 2006.

Jess A. Lorona, Esq., Ducar Lorona & Parks PC, Phoenix, AZ, for Plaintiffs.

Lisa Kay Hudson, Esq., Rebecca Smith Currey, Esq., Office of the Attorney General, Employment Law Section, Phoenix, AZ, for Defendants.

## ORDER

BROOMFIELD, Senior District Judge.

### I. Procedural Background

On June 30, 1995, Plaintiffs George Rudebusch, et al., filed the first of two now-consolidated cases, CIV 95–1313–PCT RCB. Complaint (doc. 1). Thereafter, on May 2, 1996, a complaint was filed in a related action, CIV 96–1077–PCT RCB. Complaint (doc. 1). The court granted Plaintiffs' motion to consolidate these cases on November 1, 1996.

On December 12, 2000, this case proceeded to a jury trial (Minute Entry (doc. 233)) in which evidence was considered over the course of four days. *Id.* at 233–37. On December 18, 2000, the jury rendered its verdict in Defendants' favor, and judgment was entered thereon on December 29, 2000. *See* doc.'s 241, 248.

On January 24, 2001, Plaintiffs filed their notice of appeal. Notice (doc. 250). On December 18, 2003, the Ninth Circuit Court of Appeals issued a mandate which affirmed in part, reversed in part, and remanded the case to this court for additional proceedings. Mandate (doc. 259). The sole issue remaining for determination upon remand is whether certain Defendants can be held liable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq. Id.* at 32.

At a pre-trial conference held on December 19, 2003, the parties stipulated to try the remaining issues on remand to this court, as opposed to a jury, at a trial which would commence on January 6, 2004. Minute Entry (doc. 267). Also on December 19, 2003, the parties stipulated that, for purposes of the January 6, 2004 trial, the court would determine the issue of "liability" under Title VII only, and that if a determination of liability is made, "the court will set a later trial date and will grant the parties an opportunity to conduct additional discovery" as to the question of damages. Order (doc. 268) at 3.

On January 6, 2004, the court conducted the trial as to the issue of Title VII liability as ordered in the Ninth Circuit's mandate. Minute Entry (doc. 269). On June 30, 2004, the Court issued its findings of fact and conclusions of law on this matter, finding that liability for Defendants' violation of Title VII had been established. Order (doc. 277). However, the Court noted that damages in relation to this violation are a factual issue that the parties stipulated would be presented at a later trial after additional discovery was taken. *Id.* at 20. Such discovery is now complete.

On September 28, 2005, Defendants filed a motion for summary judgment on the issue of damages. Mot. (doc. 16). Thereafter, Plaintiffs filed their response to this motion, as well as a cross-motion for summary judgment. Cross Mot. (doc. 305). These motions were fully briefed on January 23, 2006. P. Reply (doc. 315). The court, having carefully considered the ar-

## II. Overview of Case

In order to provide a general factual background for the present inquiry, the court adopts the Ninth Circuit's overview of this case, as contained in its mandate (doc. 259, at 7–11; *see also, Rudebusch v. Hughes,* 313 F.3d 506 (9th Cir.2002)):

At the time of this action, Northern Arizona University ("NAU" or "the University") was the recipient of significant federal funding and thus subject to federal regulations requiring it to implement an affirmative action plan. The plan adopted by the University, and approved by the federal government's Office of Federal Contract Compliance Programs, broadly mandated an increase in the recruitment and retention of minority faculty, as well as an assurance of parity between men and women in all areas of employment.

In terms of pay equity, the plan required the University to evaluate all employees' compensation annually for purposes of gender equity and minority integration, and at least with respect to salary inequities attributable to gender, the University was required to remedy such disparities within one year of their identification. The ultimate responsibility for assessment of disparities fell to Dr. Eugene Hughes, NAU's president.

By 1989, six of 133 full professors were women (up from three in 1985), and thirty-four of 188 associate professors were women (up from eighteen in 1985). The majority of female faculty occupied the lowest ranks of assistant professors, and even there they were far out-numbered by male faculty.

Five out of 53 faculty openings during this same time period were filled by minorities. And despite recruitment goals set for minority hiring in later years, NAU reported to the federal government in 1993 that it had lost twice as many minority faculty as it had hired during the 1991–1992 academic year. In fact, the University had lost over a quarter of its minority faculty in the two years preceding the pay adjustments—despite new hires.

Upon review of available statistics, Hughes concluded not only that there was a hiring disparity, but that overall pay inequity was also apparent. In 1989, female faculty were making on average over $8,000 a year less than male faculty. Minority faculty did not fare much better. The University's 1988 annual study noted that their mean salary was over $6,700 less than that of non-minority faculty.

These disparities prompted Hughes to conclude that some form of corrective action was necessary as early as 1990. That same year, the Arizona legislature allocated funds to NAU for general "market adjustments" to faculty salaries (i.e., adjustments ostensibly intended to make the University's salaries competitive with those of other schools). Department heads at the University were entrusted with making recommendations for individual adjustments. Hughes observed that these adjustments did not alleviate existing sex and race-based pay disparities, an observation that was confirmed by subsequent annual pay studies.

Hughes and NAU were not the only ones with concerns about pay disparity. Around the same time, the Arizona Board of Regents established the Commission on the Status of Women to report on this issue with regard to female faculty at the State's three universities. In 1991, the Commission published a study that included many of the above findings about female faculty employment between 1985 and 1989.

The Commission concluded that the absolute differences in pay "were quite large." Although some disparity could be

attributed to "the clustering of women at the lower professional ranks and their overrepresentation within disciplines that have lower salaries on the national market," the Commission concluded that even "[w]hen rank was controlled, the differences were still substantial." Additionally, the Commission noted that making adjustments for rank may be problematic since "rank is itself affected by a faculty member's sex. If it were the case that male faculty are more likely to be promoted than female, controlling for rank in the analysis would result in underestimating salary inequities."

Close to the heels of the Commission's study was NAU's own 1993 annual equity report ("Chambers' report"), authored by the head of its office of institutional research, Dr. Stephen Chambers. Chambers had been producing these reports for the University since 1986. As he explained at trial, the regression analysis Chambers employed was similar to the model used by hundreds of institutions across the United States.

In this context, regression analysis is a statistical application used to predict how salary (the dependent variable) should vary based on rank, years of service, discipline and the like (considered independent variables). The regression model isolates the likelihood that factors other than legitimate differences such as rank, i.e., factors such as discrimination, play a role in the salary disparities. The likelihood is determined by predicting what the salary should be given the legitimate factors, and measuring the difference to the actual salary (in standard deviations).

Based on this time tested analysis, the Chambers' report concluded that there were "statistical differences in gender and ethnic equity" which could be removed with $278,966 in adjustments. The report ultimately recommended various adjustments for 72% of the female faculty. A

majority of the adjustments were in the $1,001 to $3,000 per year range. The amount of each adjustment depended on how far an individual's salary fell below the predicted salary of a similarly situated white male professor. The women who were at or above this predicted salary received no adjustment.

Using the same benchmark as that used for female adjustments—the predicted salary of a similarly situated white male professor—the report recommended adjustments ranging from $250 to $6,945 for about half of the minority male faculty. The majority of the adjustments were in the $2,001 to $3,000 range.

Considering the findings of the 1993 equity report and the 1991 study on the status of women, as well as the requirements of the University's affirmative action plan, Hughes testified that he felt compelled to take remedial action in mid–1993. According to Hughes, the "usual process" of making salary adjustments involved recommendations and consultation with department chairs, deans, and the academic vice president, but because "that hadn't worked on other occasions," Hughes decided, with some modification, to adopt and implement the adjustments recommended in Chambers' 1993 report.

Hughes did not simply accept the report as prepared. Rather, Hughes undertook an administrative review of the proposed adjustments and asked Chambers to run additional regression analyses before settling on the final adjustments. In order to achieve the goal of attaining pay equity, Hughes used $207,613 of unappropriated funds (from among other sources, salaries appropriated for vacant faculty positions) in the school's existing budget to make the necessary adjustments ("1993 adjustments").

Salary adjustments were awarded to female and minority male faculty whose ac-

tual salary fell below the predicted salary of a similarly situat[ed] non-minority male. Women and minority men who were already earning their predicted salary or more did not receive any adjustments, nor did any non-minority men receive adjustments, even those whose earnings were below the predicted salary.

Sometime after Hughes instituted the salary adjustments, and also after he had left his post at the University, NAU hired two outside consultants, Donald Gantz and John Miller, to do a study on the adjustments. The Gantz/Miller study criticized several aspects of Chambers' methodology. Nevertheless, even Gantz/Miller's preferred method of analysis would have led to adjustments for 93 male minority professors totaling $164,410. The only question for Gantz/Miller was whether such adjustments would be "required." The study concluded that they were not. This finding resulted not because Gantz/Miller were unable to ascertain any unexplainable differences in pay—they in fact found a disparity for both women and for minorities—but because they concluded that these disparities were not statistically significant enough (that is, large enough) to prove that the "inequity [was] due to either gender or minority status."

This Court notes that, in 1994, Hughes' successor, Dr. Clara Lovett, granted certain retroactive salary adjustments ("1994 adjustments"). Mot. (doc. 16) at 8. The total amount allocated to the retroactive increases was approximately $693,000. *Id.* Through these adjustments, each Plaintiff received at least an increase of $1240, with several receiving a larger sum. *Id.*

### b. Issues Considered at January 6, 2004 Trial

Plaintiffs originally brought various claims for relief in the present case. After the jury found for Defendants, and a judgment was entered dismissing the case,

Plaintiffs appealed. While the Ninth Circuit affirmed as to all other issues, it determined that this court's prior grant of summary judgment in Defendants' favor concerning Plaintiffs' Title VII claim was improper. Mandate (doc. 259) at 32. Thus, the only issue before the court at the January 6, 2004 Trial was whether the 1993 adjustment was designed "to eliminate a manifest racial (or gender based) imbalance." *Id.* at 29, *quoting United Steelworkers of America, AFL–CIO–CLC v. Weber,* 443 U.S. 193, 208, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). The Court determined that liability for Defendants' violation of Title VII was established, because Defendants' actions impermissibly went beyond "attain[ing] a balance." Order (doc. 277) at 20.

### c. Damages Issue

Having found liability, the next stage of these proceedings requires the Court to consider the question of damages under Title VII. The Court, in its June 30, 2004 Order, stated that "[t]he most obvious question that must be answered by the parties at that stage is whether the 1994 raises ordered by Dr. Lovett (amounting to approximately $693,000) successfully mitigated the inequity created by the 1993 Hughes adjustments." Order (doc. 277) at 20. The Court advised the parties that, "[i]n analyzing damages, to the extent future regression analyses are undertaken, consideration should be given not only to the factors used by Chambers, but also factors that may more fully explain the existence of salary differences such as doctoral status, performance and individual difference." *Id.* at 20–21. In any event, Plaintiffs retain the burden to establish the damages they have suffered. *Id.* at 21.

### III. Summary Judgment Standard

To grant summary judgment, the Court must determine that the record before it

contains "no genuine issue as to any material fact" and, thus, "that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether to grant summary judgment, the Court will view the facts and inferences from these facts in the light most favorable to the nonmoving party. *See Matsushita Elec. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A material fact is any factual dispute that might affect the outcome of the case under the governing substantive law. *Id.* at 248, 106 S.Ct. 2505. A factual dispute is genuine if the evidence is such that a reasonable jury could resolve the dispute in favor of the nonmoving party. *Id.*

A party opposing a motion for summary judgment cannot rest upon mere allegations or denials in the pleadings or papers, but instead must set forth specific facts demonstrating a genuine issue for trial. *See id.* at 250, 106 S.Ct. 2505. Finally, if the nonmoving party's evidence is merely colorable or is not significantly probative, a court may grant summary judgment. *See, e.g., California Architectural Build. Prods., Inc. v. Franciscan Ceramics,* 818 F.2d 1466, 1468 (9th Cir.1987).

## IV. Discussion

### a. Defendants' Motion for Summary Judgment

In determining an appropriate remedy under Title VII, the Court must attempt to place the Plaintiff in the position he or she would have occupied but for the discrimination. *See Albemarle Paper Co. v. Moody,* 422 U.S. 405, 421, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Title VII provides for recovery of back pay. 42 U.S.C. § 2000e–5(g). However, back pay is not an automatic or mandatory remedy, but rather one that the Court may invoke. *Albemarle,* 422 U.S. at 415, 95 S.Ct. 2362. Congress intended that the courts use Title VII's remedial provisions to make discrimination victims whole. *Id.* at 418, 95 S.Ct. 2362. Damage calculations should be designed to estimate the difference between what the aggrieved party earned and what they would have earned but for the discrimination. *See Domingo v. New England Fish Co.,* 727 F.2d 1429, 1444 (9th Cir.1984).

In their motion for summary judgment, Defendants assert, and Plaintiffs do not dispute, that Plaintiffs seek damages under the theory that they are entitled to a retroactive and prospective salary increase to their salaries predicted in the Chambers' report. Mot. (doc. 16) at 4. Plaintiffs produced the report of Dr. Robert Toutkoushian, Ph.D., an expert in conducting and using regression analysis to determine faculty salary equity. *Id.* In his report, Toutkoushian calculated Plaintiffs' damages based on the assumption that they should have received their 1993 predicted salaries, predicted in the Chambers' report. *Id.*

Defendants challenge this theory of Plaintiffs' damages, arguing that it promulgates discrimination against female faculty and makes Plaintiffs better off than they would have been had no discrimination ever occurred. *Id.* at 1–2, 5–7. "Here, the Plaintiffs are arguably entitled to the increase, if any, they would have received if NAU had allocated the $207,000 in 1993 affirmative action pay increases to 'attain a balance.'" Mot. (doc. 16) at 7. Additionally, Defendants assert that NAU has already paid Plaintiffs increases that

make them better (or no worse) off then they would have been in the absence of discrimination. *Id.* at 2. Defendants ask the Court to find that Plaintiffs are not entitled to retroactive and prospective salary increases to the 1993 predicted salaries, and that NAU has already granted Plaintiffs an equitable back pay remedy. *Id.* at 11. Alternatively, at a minimum, Defendants ask the Court to find that Plaintiffs may not base their damages calculation on the Chambers' report. *Id.* at 7.

First, Defendants argue that the Court should deny Plaintiffs' request for damages, because their request is inappropriately based on the Chambers' report. At the outset, Defendants assert that Plaintiffs' damages calculation is inappropriate, because their request "promulgate[s] additional discrimination against female faculty, obviously erasing any appropriate measure of affirmative action." *Id.* at 5. Defendants contend that if the Court grants Plaintiffs' request, the result will be that the Plaintiffs will receive a salary that is $1206 or $1207 higher than if they had been female.[1] Mot. (doc. 16) at 5. Such a result, Defendants argue, would discriminate against female faculty and completely erase any appropriate affirmative action from the 1993 increases. *Id.*

> Simply put, a remedy designed to fix an affirmative action plan on behalf of females, that places males at an additional advantage over females, does not achieve equity.

*Id.*

Additionally, Defendants argue that the proposed remedy would place Plaintiffs in a far better position than they could have been if NAU had "distributed the 1993 equity funds in a manner designed to at-

tain balance." *Id.* at 7. Lastly, Defendants maintain that it makes no sense to fashion Plaintiffs' remedy on the very study that Plaintiffs previously condemned. *Id.*

Second, Defendants argue that Plaintiffs are not entitled to any damages, because NAU already provided them an equitable remedy by retrospectively granting them an increase of $1240 or more, dating back to the effective date of the 1993 equity increases. Mot. (doc. 16) at 8. Defendants contend that "[t]he 1994 increases constitute an equitable remedy because they leave a more measured version of affirmative action in place, while individually addressing inequities within departments." *Id.* Moreover, Defendants note that the Grantz and Miller report indicates that they found no "systematic inequities in salary level between males and females or between majority and minority class members." *Id.* at 10. Defendants note that Plaintiffs have not produced any regression analysis that shows otherwise. *Id.* Lastly, Defendants point to the EEOC's letter to Plaintiff Rudebusch that explains its determination that the 1994 salary adjustments "constituted essentially what the aggrieved parties could obtain if they filed a lawsuit under Title VII[.]" *Id., citing* Exbt. 8 (doc. 17). Defendants encourage the Court to consider the EEOC's conclusion as highly probative evidence that the 1994 increases constituted appropriate equitable back pay relief. Mot. (doc. 16) at 10.

In response to these arguments, Plaintiffs assert that the damages they request are appropriate. P. Resp. (doc. 305). First, although Plaintiffs do not dispute that their damage theory would not resolve the pay disparity for the affected

---

1. Defendants assert, and Plaintiffs do not dispute, that the predicted salaries in the Chambers' report consistently discriminated against women in the amount of $1206 or $1207 due

to the $1207 co-efficient for gender included in the analysis. DFSOF (doc. 17) at ¶ 10; P. Resp. (doc. 305) at 6.

female faculty at NAU, they argue that they "should not be punished for the female faculty members' failure to pursue relief under Title VII." *Id.* at 4.

It is unfortunate that only forty members of the class filed a complaint under Title VII and enjoy the higher standard of legal protection it provides. But it is inexcusable sophistry to argue that remedying a part of the discrimination against the class members promulgates additional discrimination against the remaining unprotected members[.]

*Id.* at 8. Additionally, Plaintiffs contend that, although the Chambers' report was flawed, using the pay raises determined by that analysis is reasonable to correct the inequity. *Id.* Plaintiffs note that the EEOC compliance manual states that "the remedy should include a salary increase and back pay in the amount of the unlawful difference between the wages of the lower and higher paid comparator(s)." *Id.*

Second, Plaintiffs assert that the 1994 salary adjustments did not successfully mitigate the inequity created by the 1993 adjustments. P. Resp. (doc. 305) at 10. In support of this statement, Plaintiffs note that Plaintiff Hood's salary, even after the 1994 adjustment, still lagged behind the salary of faculty member A.F. Lee, who was a minority faculty member in the Mathematics department. *Id.* at 11; D. Reply & Resp. (doc. 21) at 6.

... Lovett's 1994 increase to Hood of $2146, to a salary of $35146, reduced the amount of the discrimination suffered by Hood relative to Lee ... to ... $1207. *But Lovett's same 1994 adjustment gave an additional $887 to the minority male Lee, raising him to a salary of $37240.* Thus Lovett's 1994 adjustment *increases* the amount of discrimination suffered by ... Hood ... *from $1207 to $2094.* Additionally, three other Plaintiffs (Funk, Jackson, and Riskin) share exactly the same codes as Hood and Lee[.] ... In

addition, Plaintiffs Huck, Porter, and Johnson share the same market value and rank as the minority male Lee, but have *even more* experience and in Johnson's case *much more* experience than minority male Lee. None of these Plaintiffs were raised to the same level as Lee.

P. Resp. (doc. 305) at 11. Plaintiffs specifically focus their argument around the contention that each of them lagged behind their 1993 predicted salaries after the 1994 retroactive adjustments. *Id.*

It is undisputed that the 1994 adjustments granted a presumptive increase of $1240 to all non-minority males in departments where females or minorities received the 1993 increases. DFSOF (doc. 17) at ¶¶ 22–25. Moreover, it is uncontested that the 1994 adjustments considered the department in which a non-minority faculty member taught. D. Reply & Resp. (doc. 21) at 6–7; DFSOF (doc. 17) at ¶¶ 23, 29–34. For example, a non-minority faculty member received at least a $1240 increase in his salary. DFSOF (doc. 17) at ¶¶ 22–25. If, however, even after the 1994 increase was instilled, the salary of a non-minority faculty member was still below that of a comparator within his same department, the non-minority faculty member received an additional salary increase to equal that of his comparator. *Id.* at ¶¶ 23, 29–34.

Thus, Defendants explain Lee's additional increase in 1994 by the fact that, after Professor Swift, a non-minority comparator within the same department as Lee, received the 1994 adjustment, Defendant had to further raise Lee's salary in order to make it equal with Swift's new salary. D. Reply & Resp. (doc. 21) at 6. Plaintiff Hood, the party Plaintiffs use in their salary comparison to show the existence of continued pay inequity after the 1994 adjustments, was, admittedly, not a faculty

member within the same department as Lee. *Id.* at 7; P. Resp. (doc. 305) at 19. Defendants note that Professor Hood received $2146 through the 1994 adjustment due to salary equity issues within *his department,* Modern Languages. D. Reply & Resp. (doc. 21) at 6–7.

Although the parties seem to agree upon the definition of "comparator" in this matter, they do not use it as a reference point within the same context. Plaintiffs maintain that "comparator" means all the faculty who share a specific faculty member's codes for rank, tenure status, experience, and market variable, as reviewed in the Chambers' report. P. Reply (doc. 315) at 6. Using this definition, Plaintiffs argue that, because the salaries of Plaintiffs Hood, Funk, Jackson and Riskin, after the 1994 adjustments, did not equal that of their "comparator" Lee, the 1994 adjustments did not successfully mitigate the inequity created by the 1993 adjustments. *Id.* at 6–7.

In contrast, although Defendants' definition of "comparator" seems to be the same as Plaintiffs', Defendants contend that the department in which a faculty member taught was also a factor in determining the 1994 adjustments. D. Reply & Resp. (doc. 21) at 6–7. In light of this procedure, it is clear that Plaintiffs continued to experience an inequitable salary at NAU after the 1994 adjustments. The original 1993 adjustments were not based on the salaries existing within specific departments. As stated previously, the raises were based mainly on the Chambers' study, which utilized only the independent variables of experience, rank, discipline and tenure status in its faculty salary regression analysis. Order (doc. 277) at 11. Thus, although the 1994 adjustments may have equalized salaries within specific departments, they could not have placed the Plaintiffs in the positions they would have occupied but for

the discrimination. *See Albemarle,* 422 U.S. at 421, 95 S.Ct. 2362.

If Plaintiffs had received the same treatment as the minority and female faculty in 1993, they would have received an increase in pay that equaled their predicted salaries and those of their comparators, as defined in the Chambers' report. However, the 1994 adjustments only raised Plaintiffs' salaries to the point where they were allegedly equalized with their comparators within their academic departments, not their comparators school-wide. Such a methodology is different from that utilized in regard to the 1993 increases and achieves a different result. The Court concludes that the 1994 adjustments did not successfully mitigate the inequity created by the 1993 Hughes adjustments.

Furthermore, the Court disagrees with Defendants' statement that "the Plaintiffs are arguably entitled to the increase, if any, they would have received if NAU had allocated the $207,000 in 1993 affirmative action pay increases to 'attain a balance.'" Mot. (doc. 16) at 7. Neither party has disclosed a method by which the Court could determine what Plaintiffs would have received if NAU had allocated the $207,000 in 1993 to "attain a balance." Additionally, neither party has produced a calculation that includes "factors that may more fully explain the existence of salary differences such as doctoral status, performance and individual difference." Order (doc. 277) at 20–21.

In any event, although the parties do not dispute that the Chambers' report was flawed, such report was the basis of the 1993 Hughes adjustments, which, in turn, was the foundation of the Title VII violation found by the Court. Order (doc. 277) at 19–20. In light of this fact, as well as the presumed impossibility of fashioning a mathematical methodology that includes retrospective subjective factors, the Court

finds appropriate a calculation of Plaintiffs' damages based on their predicted salaries, determined in the Chambers' report.

Although such a resolution may not resolve the discrimination imposed against the affected female faculty, the Court is not currently charged with "fix[ing] an affirmative action plan," as Defendants suggest. Instead, the Court, in determining an appropriate award of damages, is required to place Plaintiffs in the position they would have been in had NAU not violated Title VII. *See Albemarle,* 422 U.S. at 418, 95 S.Ct. 2362. Thus, the Court shall deny Defendants' motion for summary judgment.

### b. Plaintiffs' Cross–Motion for Summary Judgment

■ In their cross-motion for summary judgment, Plaintiffs assert that they are entitled to economic damages as a matter of law. Cross–Mot. (doc. 305) at 12–14. Specifically, Plaintiffs contend that because this Court previously determined that Defendants violated Title VII, damages must be awarded. *Id.* at 12–13.

> In instances where the Court determines that unlawful discrimination has occurred; "back pay should be denied only for reasons, which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination."

*Id., citing Albemarle,* 422 U.S. at 421, 95 S.Ct. 2362. Plaintiffs assert that the 1994 adjustments failed to remedy the disparity between minority male faculty and non-minority male faculty, and, in some instances, increased the disparity. Cross–Mot. (doc. 305) at 14. Thus, they encourage the Court to award damages based on

Toutkoushian's calculations. *Id.* In addition, Plaintiffs argue that they are entitled to damages because "Dr. Lovett was untruthful to the faculty and to the EEOC." *Id.* at 14.

In their response to Plaintiffs' cross-motion, Defendants argue, among other things, that summary judgment should not be granted in favor of Plaintiffs because the appropriate amount of damages still remains in dispute. D. Reply and Resp. (doc. 21) at 1. Specifically, Defendants note that both parties have submitted expert witness reports and each expert has reached a different conclusion concerning the amount of damages Plaintiffs incurred. *Id.* at 1–2. Consequently, Defendants assert that summary judgment on this issue is inappropriate. *Id.*

Both parties have submitted their own expert's report regarding the damages allegedly incurred by Plaintiffs in this matter.[2] Additionally, both parties agree that their respective experts came to different conclusions regarding the appropriate calculation and amount of damages due to Plaintiffs. However, the issue of which calculation is proper in determining and awarding damages in this case is not analyzed by the parties in their briefs.

Beyond the argument that Plaintiffs should not be allowed to base their damages on the predicted salaries in the Chambers' report, discussed above, Defendants do not fully assert any additional challenges to Toutkoushian's calculation. Defendants note that their expert questions Toutkoushian's disregard of a later salary adjustment that occurred in 1995. D. Reply and Resp. (doc. 21) at 12. However, Defendants do not attempt to demonstrate that Toutkoushian's conclusions

---

**2.** Plaintiffs submit the original and supplemental reports of Dr. Robert K. Toutkoushian, Ph.D. Exbts. A & B (doc. 306). Defendants submit the report of Dr. Stephanie Thomas, Ph.D. Exbt. D (doc. 306).

about the 1995 increases are incorrect or that Thomas' conclusions are correct.

In her report, Thomas asserts that a second round of equity adjustments occurred in 1995 and, thus, should be included in the Plaintiffs' damages calculations. Exbt. D (doc. 306) at 5.

> It is my understanding that a second round of equity adjustments was granted on January 1, 1995 (hereinafter "second Lovett adjustments"). These adjustments were retroactive to July 1, 1994. It is my understanding that NAU contends the "second Lovett adjustments" were targeted to remedy any inequities created by the "Hughes adjustments". [sic] Under the assumption that these increases were targeted in such a manner, they should be taken as an offset to any earnings differentials created by the "Hughes adjustments". [sic]

*Id.* In response, Toutkoushian asserts that the 1995 adjustments should not be included in the damages calculations, because they were made to "partially address market inequities" and were awarded to all faculty. Exbt. A (doc. 306) at 2–3.

> I did not subtract these adjustments from the financial damages for the plaintiffs because it is my understanding that the second Lovett adjustments were made to partially address *market inequities* between faculty salaries at NAU and peer institutions and not to eliminate the remaining *internal salary inequities* for the plaintiffs resulting from the initial salary adjustments made to minority male faculty in FY94. It is also my understanding that the market salary adjustments were awarded to female faculty, minority male faculty, and nonminority male faculty.

*Id.* With no arguments presented by the parties on this issue, the Court is currently unable to resolve this dispute.

Additionally, the Court, upon its own review of the parties' expert reports, *found* another matter that remains unresolved regarding Plaintiffs' damages. The parties' experts seem to dispute whether it is appropriate to grant a 22 percent increase in salary for the years some Plaintiffs accepted administrative appointments at NAU. Exbt. D (doc. 306) at 13–14; Exbt. A (doc. 306) at 12. Both experts concede that they each lack sufficient information to determine what type of raise a specific Plaintiff received due to such an event. *Id.* However, lacking this information, the experts each take a different position on how this issue should be resolved. *Id.*

Toutkoushian asserts that the damages for the Plaintiffs that worked in administrative roles at NAU should be calculated to include a salary increase of 22 percent for each of the years the party served in such a capacity. Exbt. A (doc. 306) at 12.[3] He notes that this is the typical salary increase for such a position. *Id.*

> According to the plaintiffs, the stipends for administrative appointments are typically set at two-ninths of a faculty member's annual salary ... In my subsequent financial damage calculations, I will continue to assume that administrative appointments carry with them a 22 percent salary increase, but will also revise these calculations upon review of any new information in this matter.

*Id.* In contrast, Thomas argues that, due to the lack of specific information about the Plaintiffs' increases, the damages calculations should err on the side of caution and not account for any percentage in-

---

3. The Court notes that five out of the forty Plaintiffs held administrative roles at NAU.

Exbt. A (doc. 306) at 12.

crease in salary. Exbt. D (doc. 306) at 13–14.

> It is my understanding that compensation for administrative appointments at NAU varies considerably across appointments. Some appointments carry a flat stipend amount, while other appointments provide a percentage of salary compensation. For purposes of damages calculations, only those appointments paid as a percentage of salary should be considered.

*Id.* at 14. This issue was not raised by either of the parties in their briefs, however the Court concludes that it remains unresolved.

Finally, the Court notes that Toutkoushian's report attempts to eliminate any future financial damages to the eighteen Plaintiffs who are still employed by NAU. Exbt. A (doc. 306) at 16. Specifically, Toutkoushian provides calculations of the cost required to either increase the base salaries of such Plaintiffs, or award them a lump-sum payment. *Id.* In relation to the latter option, Toutkoushian provides three different scenarios where the Plaintiffs retire at either age 65, 70, or 75. *Id.*

With no argument from either party as to which option is more appropriate, it is unclear to the Court whether the parties have a position on this matter. Regardless, the Court believes that attempting to determine at what exact age these eighteen Plaintiffs will retire is mere speculation, at best. Consequently, the Court concludes that the eighteen listed Plaintiffs who are still employed at NAU shall receive an increase in their current salaries and not a lump-sum payment.

To grant summary judgment, the Court must determine that the record before it contains "no genuine issue as to any material fact" and, thus, "that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court concludes that, except for the contested status of the 1995 adjustments and the 22 percent increase for administrative positions, genuine issues of material fact do not remain in regard to Plaintiffs' damages. Thus, the Court shall grant in part and deny in part Plaintiffs' cross-motion for summary judgment. The cross-motion shall be denied as to the two remaining disputed issues defined above, as well as the final total amount of damages. Additionally, the Court shall deny Plaintiffs' request for attorneys' fees, as the request was not properly filed in accordance with Local Rule 54.2. Plaintiffs' cross-motion shall be granted in all other respects.

Therefore,

IT IS ORDERED that Defendants' Motion for Summary Judgment (doc. 16 in case number CIV 96–1077 PCT RCB) is DENIED.

IT IS FURTHER ORDERED that Plaintiffs' Cross–Motion for Summary Judgment (doc. 305 in case number CIV 95–1313 PCT RCB) is GRANTED in part and DENIED in part, in accordance with this order.

IT IS FURTHER ORDERED that, absent either side providing within twenty (20) days of the date of this order competent evidence that would establish actual percentage increases for administrative positions, the judgment for plaintiffs will include a 22% increase for each Plaintiff who occupied an administrative position.

IT IS FINALLY ORDERED that, absent a contention by either party that they have competent evidence to establish the purpose of the 1995 adjustments and provides such evidence to the Court within twenty (20) days of the date of this order, the Court shall presume that the "understandings" in both Toutkoushian's and Thomas' reports cannot be established, and, consequently, the 1995 adjustments

cannot and will not be taken into account in . . . determining Plaintiffs' damages.